689 S.E.2d 1

Langley and Inez FRANCE, individually and as the Parents and Next Friends of Robert France, a minor, Plaintiffs Below, Appellants

v.

SOUTHERN EQUIPMENT COMPANY, a West Virginia Corporation; and Quality Metal Roof Manufacturing and Sales, Inc., a West Virginia Corporation, Defendants Below, Appellees

and

Southern Equipment Company, Third–Party Plaintiff Below, Appellee

v.

Dan Hensley, d/b/a/ Royalty Builders, Third–Party Defendant Below.

No. 34494.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 2, 2009.

Modified Opinion Filed Jan. 28, 2010.

L. Lee Javins, II, Esq., Guy R. Bucci, Esq., D. Blake Carter, Jr., Esq., Bucci Bailey & Javins, L.C., Charleston, WV, for Appellant.

Gary E. Pullin, Esq., Molly K. Underwood, Esq., Pullin, Fowler, Flanagan, Brown & Poe, PLLC, Charleston, WV, for Appellee, Southern Equipment Company.

KETCHUM, Justice:

In this appeal from the Circuit Court of Logan County, a plaintiff seeks to reverse a circuit court order granting summary judgment in favor of a defendant. The circuit court's order held that the defendant owed no duty of care to the plaintiff under our independent contractor defense.

As set forth below, we affirm the circuit court's summary judgment order in favor of the defendant.

## I.

### Facts and Background

In the Spring of 2006, plaintiff Robert France was 16 years old and in the 10th grade in high school. Third-party defendant Danny Hensley, doing business under the name "Royalty Builders" (hereafter referred to as "Royalty Builders") hired Mr. France to work for him as a roofer during his Spring Break from high school. The plaintiff had never done roofing or construction work in the past.

Defendant Southern Equipment Company ("Southern Equipment") owned a building in Logan County, West Virginia that needed a new sheet metal roof. Southern Equipment obtained an estimate for the purchase and installation of a new roof from defendant Quality Metal Roof Manufacturing and Sales, Inc. ("Quality Metal Roof"). Satisfied with the estimate, Southern Equipment gave Quality Metal Roof a down payment for the cost of complete "installation and removal" of the roof.

Unbeknownst to Southern Equipment, Quality Metal Roof did not remove or install roofing materials. Quality Metal Roof did not tell Southern Equipment that it only manufactured and supplied sheet metal roofing materials, and hired another company to install the customer's new roof. After receiving the down payment from Southern Equipment, Quality Metal Roof hired Royalty Builders to install Southern Equipment's new roof. Quality Metal Roof never informed Southern Equipment that Quality Metal Roof employees were not installing the new roof.

On April 12, 2006, a crew of eight workers for Royalty Builders—including the plaintiff—were working to replace Southern Equipment's sheet metal roof. The parties agree that none of Royalty Builders's workers employed any safety equipment to protect against falling, and that Southern Equipment had no knowledge of the requirement for, or lack of use of, safety equipment.

When the plaintiff stepped on a piece of sheet metal that had been loosened, the sheet flipped and the plaintiff fell through the roof, landing on the concrete floor approximately 25 feet below. The plaintiff sustained a serious head injury in the fall, and continues to suffer deficits as a result of the fall.

On August 11, 2006, plaintiff Robert France—through his parents Langley and Inez France—filed this lawsuit[1] against Quality Metal Roof and against Southern Equipment Company. Royalty Builders, the installer of the roof and the plaintiff's employer, was not sued by the plaintiff.[2] The plaintiffs' complaint alleged that Quality Metal Roof and Southern Equipment had failed to provide the plaintiff with a reasonably safe work environment, because they failed to require Royalty Builders's employees to use some means of fall protection, or otherwise guard against the plaintiff falling through the roof. The plaintiffs also contended that defendants Quality Metal Roof and Southern Equipment were vicariously liable and strictly liable to the plaintiff for the negligence of Royalty Builders, because the defendants exposed him to the "abnormally and inherently dangerous task of removing and installing roofing." Lastly, the plaintiffs asserted that the defendants were negligent in the selection and hiring of Royalty Builders, in part because Royalty Builders employed "child labor" to perform roofing work in violation of state and federal law.

After substantial discovery and a mediation session, defendant Quality Metal Roof—which hired Royalty Builders to install the new roof—settled with the plaintiffs for $875,000.00.

Defendant Southern Equipment, however, filed a motion for summary judgment pursuant to Rule 56(c) of the *Rules of Civil Procedure.* Southern Equipment argued in its motion that it owed no legal duty of care to Robert France. First, Southern Equipment contended that Royalty Builders was an independent contractor that it simply did not

---

1. The original complaint only sought damages on behalf of the plaintiff. An amended complaint was later filed that sought consortium damages for the plaintiff's parents as well.

2. Southern Equipment later filed a third-party complaint against Danny Hensley, d/b/a Royalty Builders.

hire, and over which Southern Equipment did not retain the right to control the details of the work being performed. Furthermore, Southern Equipment argued that it could not be responsible for negligently hiring Royalty Builders—the plaintiff's employer—because it was undisputed that Southern Equipment did not hire and did not contract with Royalty Builders to remove and install the roof at its facility. Instead, Southern Equipment argued that the evidence plainly showed that it contracted to hire Quality Metal Roof, which then hired Royalty Builders without the knowledge of Southern Equipment. Additionally, Southern Equipment argued that Royalty Builders was an independent contractor, because Southern Equipment was not actively involved in the day-to-day operations or activities of Royalty Builders and did not continually monitor the work area. Lastly, Southern Equipment argued that roofing is not an inherently dangerous activity for which a property owner could be subjected to strict liability.

On November 6, 2007, the circuit court entered an order adopting Southern Equipment's arguments and granting summary judgment to Southern Equipment on all claims against it by the plaintiffs.

The plaintiffs now appeal the circuit court's November 6, 2007 order.

## II.

### Standard of Review

■ We review a circuit court's order granting summary judgment *de novo*. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

## III.

### Discussion

■ The circuit court order granting summary judgment determined that Southern Equipment owed no duty of care to the plaintiff, Robert France. As we have stated, the determination of whether a defendant owes a particular plaintiff a duty of care is a question of law. In Syllabus Point 5 of *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576 (2000), we ruled:

The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.

The plaintiffs argue on appeal that the circuit court's summary judgment order was wrong in three respects, and contend that questions of fact exist regarding whether Southern Equipment owed plaintiff Robert France a duty of care. First, the plaintiffs argue that the circuit court erred in ruling that Southern Equipment owed no duty to Robert France because he was employed by an independent contractor (Royalty Builders), and specifically argue that the circuit court erred in finding that Southern Equipment could not be held liable under the "illegal activity" exception to the independent contractor defense. Second, the plaintiffs argue that the circuit court improperly held that replacing roofing materials is not an "inherently dangerous" activity. And finally, because the plaintiffs' expert was of the opinion that Southern Equipment could be held liable as an "employer" under federal safety laws, the plaintiffs assert that the circuit court erred in interpreting those same federal safety laws differently from the plaintiffs' expert to find that Southern Equipment was not an "employer" on a "multi-employer worksite" as defined in those laws. We address these arguments in turn.

### A. Exceptions to the Independent Contractor Defense

■ The circuit court recognized that the threshold inquiry in this case was whether Royalty Builders was an independent contractor for Southern Equipment. We have held that "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servant." *Peneschi v. National Steel Corp.*, 170 W.Va. 511, 521, 295 S.E.2d 1, 11 (1982) (*quoting Restatement (Second) of Torts*, § 409 (1976)).

■ In *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990), we set forth four factors for courts to consider when deciding

whether a defendant is an "employer" who can be held vicariously liable for a contractor's negligence. We stated, in Syllabus Point 5 of *Paxton*, that it is the power to control the subordinate's work that is determinative of whether an employer-employee relationship exists:

> There are four general factors which bear upon whether a master-servant relationship exists for purposes of the doctrine of *respondeat superior:* (1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative.

In Syllabus Point 1 of *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976), we specified that if a defendant establishes that it had no right to control a contractor's work, then the contractor is an "independent contractor:"

> One who would defend against tort liability by contending that the injuries were inflicted by an independent contractor has the burden of establishing that he neither controlled nor had the right to control the work, and if there is a conflict in the evidence and there is sufficient evidence to support a finding of the jury, the determination of whether an independent contractor relationship existed is a question for jury determination.

In *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 524 S.E.2d 688 (1999) we clarified that a defendant may exercise broad supervision of an independent contractor's work, and yet still not "control the work" to such a degree as to make the contractor an "employee." We stated, in Syllabus Point 4 of *Shaffer*, that:

> An owner who engages an independent contractor to perform a job for him or her may retain broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the contract—including the right to inspect, to stop the work, to make suggestions or recommendations as to the details of the work, or to prescribe alterations or deviations in the work—without changing the relationship from that of owner and independent contractor, or changing the duties arising from that relationship.

In the instant case, the circuit court concluded from an examination of the record that there was no question of material fact that Southern Equipment "neither engaged Royalty Builders to do the work nor had any power to control the work." The circuit court therefore concluded that Royalty Builders was an independent contractor, and concluded that Southern Equipment could not be held vicariously liable as Royalty Builders's—and thereby, plaintiff Robert France's—employer.

### 1. The illegal work exception to the independent contractor defense

On appeal, the plaintiffs argue that the circuit court erred in holding that Southern Equipment was entitled to avoid liability under the independent contractor defense. The plaintiffs contend that, as a matter of law, 16–year–old Robert France's employment by Royalty Builders was illegal under state and federal law.[3] The plaintiffs further contend that if a defendant knows of

---

3. *W.Va.Code*, 21–6–2(a)(16) [2002] plainly states:
 (a) No child under eighteen years of age may be employed, permitted or suffered to work in, about, or in connection with any of the following occupations: . . .
 (16) Roofing operations above ground level[.]
 Federal law also prohibits children between the ages of 16 and 18 from working in the roofing industry. 29 U.S.C.A. § 212(c) prohibits an employer from using "oppressive child labor" in commerce, and 29 U.S.C.A. § 203(*l*)(2) defines "oppressive child labor" as a condition of employment under which:
 . . . any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Secretary of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being[.]
 The Secretary of Labor has declared roofing operations to be hazardous for children between the ages of 16 and 18, stating in 29 C.F.R. § 570.67(a):
 All occupations in roofing operations and all occupations on or about a roof are particularly hazardous for the employment of minors between 16 and 18 years of age or detrimental to their health.

or sanctions illegal conduct by an independent contractor, then the defendant may be held liable for the contractor's conduct. The plaintiffs assert that a manager for Southern Equipment testified in a deposition that he briefly saw the plaintiff working on the company's sheet metal roof and thought he was a "kid" who was "young," "younger than the other people that was working [on the roof.]" Putting these assertions together, the plaintiffs argue that a question of fact exists regarding whether Southern Equipment knew Robert's employment by Royalty Builders was illegal, and therefore argue that a question of fact exists regarding whether Southern Equipment may avoid liability under the independent contractor defense.[4]

■ The plaintiffs' argument is based solely upon the second element of the illegal work exception to the independent contractor defense, which we delineated in Syllabus Point 6 of *Shaffer v. Acme Limestone Co., Inc., supra,* where we said (with emphasis added):

> The independent contractor defense is unavailable to a party employing an independent contractor when the party (1) causes unlawful conduct or activity by the independent contractor, or (2) **knows of and sanctions the illegal conduct or activity by the independent contractor,** and (3) such unlawful conduct or activity is a proximate cause of an injury or harm.

Defendant Southern Equipment concedes that the plaintiff was illegally employed by Royalty Builders. However, Southern Equipment argues that the plaintiffs are ignoring the elements of proof required by Syllabus Point 6 of *Shaffer.*

The second element of the test set forth in Syllabus Point 6 of *Shaffer* requires proof by the plaintiffs of two things—that Southern Equipment both knew of *and* sanctioned the illegal conduct or activity—before Southern Equipment can be stripped of the indepen-

dent contractor defense. Southern Equipment argues that there is no evidence in the record from which a jury could deduce that, before the accident occurred, Southern Equipment *actually knew* that the plaintiff was under-aged, and—more importantly—no evidence that Southern Equipment *sanctioned* Royalty Builders's illegal employment of the plaintiff. Southern Equipment contends that the record is clear that it never retained Royalty Builders, but rather hired defendant Quality Metal Roof to do the roofing work. Unbeknownst to Southern Equipment, Quality Metal Roof retained Royalty Builders, and it was Royalty Builders who illegally hired the plaintiff to work during the week of Spring Break. Southern Equipment takes the position that the fact that Southern Equipment's manager briefly saw a younger person than the other workers on the roof does not equate to knowledge or the sanctioning of the illegal employment of the plaintiff.

Further, Southern Equipment argues that the facts in this case are substantially different from those in *Shaffer v. Acme Limestone, supra,* so different that it is clear that the exception to the independent contractor defense adopted in *Shaffer* is inapplicable to the instant case.

In *Shaffer,* the plaintiff's decedent was killed in a collision with a truck that allegedly had defective brakes. The plaintiff produced evidence showing that the truck—owned by Spade Trucking—had been routinely overloaded, in violation of state law, with stone by defendant Acme Limestone, and that this illegal activity had damaged the truck's brakes. Acme argued that it could not be held liable because Spade Trucking was an independent contractor. The Court, however, adopted the above-cited Syllabus Point 6 as an "illegal activity" exception to the independent contractor defense. Because Acme Limestone had participated in illegally over-

---

4. It appears that the plaintiffs did not make this precise argument before the trial court. "Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered." *Shaffer v. Acme Limestone Co., Inc.,* 206 W.Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999). *See also, Whitlow v. Board of Education,* 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993) ("Our general rule in this regard is that, when nonjurisdictional questions have not been decided at the trial court level and are then first raised before this Court, they will not be considered on appeal."). However, we believe the issue was sufficiently presented such that we may allow an exception to our general rule.

loading its contractor's trucks, the Court concluded that a jury could find Acme Limestone liable for knowing of and sanctioning the illegal conduct or activity by the independent contractor, if that illegal activity proximately caused the plaintiff's injuries.

Southern Equipment argues that, as the Court noted in *Shaffer*, an employer is not liable for the negligence of an independent contractor where the work is "not in itself unlawful[.]" *Shaffer*, 206 W.Va. at 345, 524 S.E.2d at 700 (*quoting Law v. Phillips*, 136 W.Va. 761, 771, 68 S.E.2d 452, 458 (1952)). Southern Equipment asserts that roofing work is not in itself unlawful. It also contends that, unlike the defendant employer in *Shaffer*, Southern Equipment did not know of, sanction, or engage in or facilitate any illegal conduct by the independent contractor, Royalty Builders.

▇▇▇ After carefully examining the record, we agree with Southern Equipment's arguments. On this record, we see nothing to suggest that Southern Equipment sanctioned Robert's illegal employment in the roofing business by Royalty Builders. To "sanction" an activity requires some active approval or encouragement.[5] In *Shaffer v. Acme Limestone*, we found that an employer could be held liable for the acts of an independent contractor because it had sanctioned illegal conduct by actually engaging in and facilitating the overloading of trucks with stone. Clearly, our holding in *Shaffer* requires something more than the passing knowledge of a Southern Equipment manager when he briefly looked up on the roof and saw someone who looked younger than his co-workers. There is no evidence that the manager thought that the plaintiff was under-aged (16 years old), or thought that illegal conduct was taking place, and certainly no evidence suggesting that the manager approved of and encouraged the illegal employment of the plaintiff by Royalty Builders.[6] Our ruling in this case in no way expands or restricts this Court's legal holdings in *Shaffer*.

▇▇▇ Additionally, our law is clear that a property owner only has a duty to turn over a reasonably safe workplace to an independent contractor; the property owner generally cannot be held liable for any hazards thereafter created by the independent contractor.

▇▇▇ *W.Va.Code*, 21–3–1 [1937] states, in part:

Every employer and every owner of a place of employment, place of public assembly, or a public building, now or hereafter constructed, shall so construct, repair and maintain the same as to render it reasonably safe.

*See also*, Syllabus Point 3, *Pack v. Van Meter*, 177 W.Va. 485, 354 S.E.2d 581 (1986) ("Under W.Va.Code, 21–3–1, the employer

---

5. The word "sanction" is generally defined as "Official approval or authorization … to approve, authorize or support," *Black's Law Dictionary* 1458–59 (9th Ed. 2009); "authoritative permission or approval, as for an action," *Random House Unabridged Dictionary* 1698 (2nd Ed. 1987); and "To ratify or confirm by … solemn enactment…. To permit authoritatively; to authorize; in looser use, to countenance, encourage by express or implied approval," XIV *The Oxford English Dictionary* 441 (2nd Ed. 1989). *See also, Bowling v. Ansted Chrysler–Plymouth–Dodge, Inc.*, 188 W.Va. 468, 473, 425 S.E.2d 144, 149 (1992) (*quoting* 3A *Fletcher's Cyclopedia of Corporations* § 1135 at 267 (Perm. ed. 1986)) (stating that a corporate officer accused of "sanctioning" fraud "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval."); *Johns v. Allen*, 231

F.Supp. 852, 857 n. 6 (D.C.Del.1964) ("To sanction can mean and we use the phrase here to mean 'to give approval to, to give countenance to.' ").

6. We also note that the third element of proof required by Syllabus Point 6 of *Shaffer* is a showing by the plaintiff that "such unlawful conduct or activity is a proximate cause of an injury or harm." The plaintiffs in the instant case have repeatedly indicated that the primary cause of Robert France's injury was the failure by Royalty Builders to employ fall restraints and other safety equipment. We cannot discern from the record in the instant case, and the plaintiffs have not directed us to any evidence, showing how the plaintiff's age was a proximate cause of his injury. However, as we are able to resolve this case solely through application of the second element of the *Shaffer* test, we decline to analyze this third element any further.

and the owner of a place of employment, place of public assembly, or a public building is affixed with a statutory responsibility to maintain such place in a reasonably safe condition."). We have made clear, however, that once an independent contractor assumes control of the premises, the property owner is relieved of liability for conditions created by the independent contractor. As we said in Syllabus Point 3 of *Henderson v. Meredith Lumber Co., Inc.*, 190 W.Va. 292, 438 S.E.2d 324 (1993):

When the owner of a place of employment provides a reasonably safe workplace and exercises no . control thereafter, the owner has complied with the responsibilities imposed under *W.Va.Code* 21–3–1 [1937].

To the same effect, in Syllabus Point 3 of *Taylor v. Sears, Roebuck and Co.*, 190 W.Va. 160, 437 S.E.2d 733 (1993) we ruled that:

The "reasonably safe place to work" theory may not be used against the owner of a place of employment when the owner exercises no control over the equipment provided by the contractor for use by the contractor's employees.

The central point of these two cases is that a property owner's duty under *W.Va.Code*, 21–3–1 "is directly related to employment activity—activity controlled by the employer—and the owner's duty is limited to providing a reasonably safe workplace, unless the owner continues to exercise control of the place of employment." *Henderson v. Meredith Lumber Co., Inc.*, 190 W.Va. at 294, 438 S.E.2d at 326.

In the instant case, the record is clear that Southern Equipment turned over a reasonably safe workplace to Royalty Builders and its employees, and thereafter exercised no control of the manner in which the roofing work was performed nor any control over the equipment used by Royalty Builders. On this record, the circuit court did not err in finding no question of material fact suggesting that Southern Equipment sanctioned Royalty Builders's illegal employment of the plaintiff.

7. "The terms inherently dangerous and intrinsically dangerous are synonymous. See Restatement (Second) of Torts § 427 cmt. b (1965)."

## 2. The inherently dangerous work exception to the independent contractor defense

Another exception to the general rule that an employer is not liable for the negligent conduct of an independent contractor is when the contractor is performing "inherently dangerous" or "intrinsically dangerous" work.[7] "The dangerous work exception to the independent contractor defense is that if the employer of the independent contractor knows the work is hazardous or dangerous, he cannot escape liability." *Pasquale v. Ohio Power Co.*, 187 W.Va. 292, 303 n. 18, 418 S.E.2d 738, 749 n. 18 (1992). As we ruled in Syllabus Point 2 of *King v. Lens Creek Ltd. Partnership*, 199 W.Va. 136, 483 S.E.2d 265 (1996):

A principal has a non-delegable duty to exercise reasonable care when performing an inherently dangerous activity; a duty that the principal cannot discharge by hiring an independent contractor to undertake the activity.

*See also*, Syllabus Point 1, *Chenoweth v. Settle Eng'rs, Inc.*, 151 W.Va. 830, 156 S.E.2d 297 (1967) (*overruled, in part, on other grounds by Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976)) ("The general rule is that where one person has contracted with a competent person to do work, not in itself unlawful or intrinsically dangerous in character, and who exercises no supervision or control over the work contracted for, such person is not liable for the negligence of such independent contractor or his servants in the performance of the work.").

The purpose of the inherently dangerous work exception was stated this way:

An inherently dangerous function cannot be delegated because the responsibility to ensure that all reasonable precautions are taken before engaging in a dangerous activity is of such importance to the community that the principal should not be permitted to transfer its duty to another. W. Page Keeton et al., *Prosser and Keeton on*

*King v. Lens Creek Ltd. Partnership*, 199 W.Va. 136, 141 n. 7, 483 S.E.2d 265, 270 n. 7 (1996).

*the Law of Torts* § 71, at 511–12 (5th ed. 1984).

*King,* 199 W.Va. at 142 n. 9, 483 S.E.2d at 271 n. 9. "The exception is grounded in a recognition that the possibility of harm to others is so great when the work activity is inherently dangerous that the law tolerates it only on terms of insuring the public against injury. We impose vicarious liability under these circumstances to insure that the public has legal access to a financially responsible party." *Shaffer,* 206 W.Va. at 343, 524 S.E.2d at 698 (*quoting D.B. Griffin Warehouse, Inc. v. Sanders,* 336 Ark. 456, 465, 986 S.W.2d 836, 840–41 (1999)). *See also Peneschi,* 170 W.Va. at 521, 295 S.E.2d at 12 ("the employer of an independent contractor cannot insulate himself from liability to third parties for the consequences of the use of abnormally dangerous instrumentalities by employing an independent contractor."). "This rule was intended for application to commercial enterprises, i.e., contractors and subcontractors, not to homeowners who hire independent contractors to do work on their homes." *Kizer v. Harper,* 211 W.Va. 47, 59, 561 S.E.2d 368, 380 (2001) (Davis, J., dissenting).

In the instant case, the plaintiffs argue that the trial court erred in its conclusion that the sheet metal roofing work at the Southern Equipment facility was not inherently dangerous because the risk of harm could have been "eliminated by using reasonable care." *See Shaffer,* 206 W.Va. at 343, 524 S.E.2d at 698 (*quoting Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 978 (Ind.1998)) ("Work is intrinsically dangerous if the risk of injury involved cannot be eliminated or significantly reduced by taking proper precautions.").

 We must therefore define inherently dangerous work, and determine if the removal and installation of sheet metal roofing meets that definition. Syllabus Point 3 of *King v. Lens Creek Ltd. Partnership,* contains the following definition:

To constitute an inherently dangerous activity, the work must be dangerous in and of itself and not dangerous simply because of the negligent performance of the work, and that danger must be naturally apprehended by the parties when they contract. Only then will the work constitute an inherent danger that places a non-delegable duty upon the one ordering it to protect third parties against the resulting injury.[8]

"It is sufficient if there is a recognizable and substantial danger inherent in the work, as distinguished from a danger collaterally created by the independent negligence of the contractor, which latter might take place on a job itself involving no inherent danger." *Shaffer,* 206 W.Va. at 344, 524 S.E.2d at 699 (*quoting Woodson v. Rowland,* 329 N.C. 330, 351, 407 S.E.2d 222, 235 (1991)).

 To be clear, it is the task itself that must be inherently dangerous; if the danger is created by a contractor's negligence, or the danger could be reduced or eliminated by taking reasonable precautions, then the task is not inherently dangerous. An example of this principle in action is found in *Robertson v. Morris,* 209 W.Va. 288, 546 S.E.2d 770 (2001) (*per curiam* ), a case with facts comparable to the instant case.

In *Robertson,* a homeowner hired a Mr. Adkins to cut down a tree. Mr. Adkins then hired plaintiff Robertson to perform the work. As the plaintiff was working in the tree, a gust of wind knocked him to the ground causing severe injuries. The plaintiff was not wearing a safety rope or any safety equipment when he was injured. 209 W.Va. at 289, 546 S.E.2d at 771.

 The plaintiff in *Robertson* argued that the defendant homeowner was not entitled to rely on the independent contractor defense, in part because cutting down trees is inherently dangerous work. 209 W.Va. at 289–90, 546 S.E.2d at 771–72. We stated the

---

**8.** We note that Syllabus Point 3 of *King v. Lens Creek* is specifically intended "to protect third parties against the resulting injury." By "third parties," the term seems to imply strangers to the contract between the party seeking to delegate the inherently dangerous activity, and the party seeking to perform the activity. We question whether the employees of the party contracted to do inherently dangerous work qualify as "third parties" to the contract. We leave the resolution of this question to another day.

rule that when one employs an independent contractor to do inherently dangerous work,

the employing party may be liable for a worker's injury even if the employing party does not exercise control sufficient to convert the relationship into an employment or agency relationship—*but this is true only if the risk involved cannot be eliminated or significantly reduced by taking proper precautions.*

209 W.Va. at 291–92, 546 S.E.2d at 773–74 (emphasis added). We ruled against the plaintiff in *Robertson,* and found that the risk of cutting down the defendant's tree "could have been significantly eliminated or reduced by using safety ropes or safety equipment." 209 W.Va. at 292, 546 S.E.2d at 774. We therefore concluded that "the work was not so inherently dangerous to bring into play" the inherently dangerous work exception. *Id.*

We believe that the same reasoning applies to the instant case. Removing or installing a sheet metal roof may only be considered inherently or intrinsically dangerous if the risk of falling off or through the roof could not be eliminated or significantly reduced by taking proper precautions. The plaintiffs have repeatedly asserted throughout the litigation below that plaintiff Robert France's injuries were caused by the failure of Royalty Builders to take proper precautions. On this record, we believe that the risk to the plaintiff could have been eliminated or reduced by the reasonable use of safety ropes or other fall protection equipment by Royalty Builders—which, as we have noted before, was not sued by the plaintiffs.

Accordingly, we cannot say that the circuit court erred in ruling that the roofing activity at the Southern Equipment facility was not inherently dangerous.

### B. Multi–Employer Worksite Under OSHA

■ The plaintiff's third and final argument concerns the Federal Occupational Safety and Health Act, 29 U.S.C.A. § 651, *et seq.* ("OSHA"). The plaintiff asserts that the circuit court erred in its holding that the "Federal Occupational Safety and Health Act does not apply to the owner of premises where the worker is an independent contractor and not an employee of the owner." As best we understand, the plaintiffs appear to argue that Southern Equipment's facility was a "multi-employer worksite," and because Southern Equipment was required by OSHA to provide safety measures to protect its own employees from the hazards of the roof replacement—hazards like objects falling through the roof—the plaintiffs argue that Southern Equipment was also required by OSHA to provide safety measures to protect the employees of independent contractors working on the premises.

As legal authority for this proposition, the plaintiffs rely entirely upon the opinion of their expert, Donovan Grenz, who offered his opinion that OSHA regulations define the Southern Equipment jobsite as a "multi-employer worksite," [9] and that Southern Equipment was required to provide safety equipment to the employees of Royalty Builders. Defendant Southern Equipment, however, cites us to several cases interpreting OSHA—cases which convince us that Southern Equipment may *not* be held liable under OSHA under the multi-employer worksite theory. *See, e.g., Cochran v. International Harvester Co.,* 408 F.Supp. 598, 602 (W.D.Ky.1975) ("[T]he Act does not apply where the worker was an independent contractor and not an employee of the owner.").

Before we address the law of a "multi-employer worksite," we note that we are troubled by the substance—or lack thereof—of the plaintiffs' argument. The entirety of the plaintiffs' argument is that a question of fact exists under the "multi-employer worksite" rule solely because the plaintiffs' expert witness interpreted OSHA laws and regulations to apply to the roofing job on Southern Equipment's building. He opined that, under OSHA, Southern Equipment qualified as a matter of law as the controlling worksite employer, and was required to provide fall protection.

---

9. We note that the OSHA regulations cited by the plaintiffs in their brief pertain to the elimination of fall hazards, not multi-employer worksites.

 Rule 702 of the *West Virginia Rules of Evidence* only allows an expert to give an opinion that "will assist the trier of fact to understand the evidence or to determine a fact in issue[.]"[10] An expert is not allowed by Rule 702 to usurp the role of the judge to determine the law of the case, or to instruct the trier of fact as to the applicable law. "It is a general rule of law that it is the duty of the jury to take the law from the court and to apply that law to the facts as it finds them from the evidence. The [jury] instructions are the law of the case." *Nesbitt v. Flaccus,* 149 W.Va. 65, 77, 138 S.E.2d 859, 867 (1964) (citation omitted).

> The trial judge is the "sole source of the law," and witnesses should not be allowed to testify on the status of the law, just as counsel are forbidden to argue law to jurors. Hearing statements of "the law" from several sources would not be helpful to jurors.
>
> . . .
>
> . . . [A]n expert's testimony is proper under Rules 702 and 704 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function. However, when the purpose of testimony is to direct the jury's understanding to the legal standards upon which their verdict must be based, the testimony should not be allowed. A witness, expert or non-expert, should not be allowed to define the law of the case.
>
> Indeed, it is black-letter law that it is not for witnesses but for the judge to instruct the jury as to applicable principles of law. In our legal system, purely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge. The danger is that the jury may think that the "expert" in the particular branch of the law knows more than the judge—surely an impermissible inference in our system of law.

Because the jury does not decide such pure questions of law, such testimony is not helpful to the jury and so does not fall within the literal terms of Rule 702[.]

2 Franklin D. Cleckley, *Handbook On Evidence For West Virginia Lawyers* § 7–4(B), pp. 7–78–7–79 (2000).

 Generally, it is not permissible for an expert to opine as to the law of the case, or instruct the trial court as to the applicable law of the case. As we stated in *Jackson v. State Farm Mut. Auto. Ins. Co.,* 215 W.Va. 634, 643, 600 S.E.2d 346, 355 (2004):

> As a general rule, an expert witness may not give his [or her] opinion on a question of domestic law [as opposed to foreign law] or on matters which involve questions of law, and an expert witness cannot instruct the court with respect to the applicable law of the case, or infringe on the judge's role to instruct the jury on the law. So an expert may not testify as to such questions of law as the interpretation of a statute . . . or case law . . . or the meaning of terms in a statute . . . or the legality of conduct. 32 C.J.S. *Evidence* § 634, at 503–04 (1996) (footnotes omitted). *See also* John W. Strong, *McCormick On Evidence,* Vol. 1 § 12, p. 53 (1999) (stating that "[r]egardless of the rule concerning admissibility of opinion upon ultimate facts, at common law[,] courts do not allow opinion on a question of law, unless the issue concerns foreign law." (Footnotes omitted.)).

 "Perhaps the most fundamental rule of our system of jurisprudence is that questions of fact are to be determined by a jury and questions of law by a court." *Fitzwater v. Spangler,* 150 W.Va. 474, 478, 147 S.E.2d 294, 296 (1966). To uphold this axiom we hold that, as a general rule, an expert witness may not testify as to questions of law such as the principles of law applicable to a case, the interpretation of a statute, the

---

**10.** There are exceptions to this general rule in complex cases, and in cases involving foreign law. *See, e.g.,* Rule 44.1, *W.Va. Rules of Civil Procedure* [1998] ("A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining for- eign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the West Virginia Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.").

meaning of terms in a statute, the interpretation of case law, or the legality of conduct. It is the role of the trial judge to determine, interpret and apply the law applicable to a case.

We now turn to the legal question regarding OSHA requirements on a "multi-employer worksite," and we begin our analysis of the law by looking to the Federal OSHA statutes. The OSHA statutes state that only an "employer" may be liable under the Act for death or serious injuries to "employees." 29 U.S.C.A. § 654(a) [1970] states that each "employer:"

> (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

> (2) shall comply with occupational safety and health standards promulgated under this chapter.

29 U.S.C.A. § 652(5) [1998] provides the definition of "employer":

> The term "employer" means a person engaged in a business affecting commerce who has employees, but does not include the United States (not including the United States Postal Service) or any State or political subdivision of a State.

■ The OSHA statutes do not make reference to the "multi-employer worksite" concept. It appears, however, that the doctrine was developed under the auspices of 29 U.S.C.A. § 654(a)(2) for application to cases involving general contractors at multi-contractor worksites. In these cases, a hazard created and controlled by one contractor can affect the safety of employees of other contractors on the site. A general contractor supervising a construction project that employs multiple subcontractors—where the general contractor oversees the details of the work—has a duty of safety to all workers on the site, and will be held liable for safety violations that could reasonably have been prevented or abated by reason of the general contractor's supervisory capacity.[11]

Our research of the law of "multi-employer worksites" supports the trial court's interpretation of OSHA. Courts appear to be nearly unanimous in holding that the owner of premises on which work is being done—whether by one contractor or by more than one independent contractors—is not a responsible "employer" under OSHA.

For example, in *Kane v. J.R. Simplot Co.,* 60 F.3d 688 (10th Cir.1995), a property owner hired an independent contractor to paint its grain silos. An employee of the independent contractor was injured when he fell from scaffolding—scaffolding owned and erected by the independent contractor—that had improperly secured by his supervisor. When the injured employee brought suit against the property owner, the court of appeals affirmed the dismissal of the suit. The court concluded that the property owner "had no duty to enforce OSHA regulations for work over which it had no control," and no duty under OSHA "when an independent contractor is hired, and the employer has no control of the work place." 60 F.3d at 694.[12]

**11.** *See, e.g., Bechtel Power Corp. v. Secretary of Labor,* 548 F.2d 248 (8th Cir.1977) (because Bechtel's functions as construction manager were "an integral part of the total construction," Bechtel could be held liable for safety violations of subcontractor's employees); *Marshall v. Knutson Const. Co.,* 566 F.2d 596, 599 (8th Cir.1977) ("General contractors normally have the responsibility and the means to assure that other contractors fulfill their obligations with respect to employee safety where those obligations affect the construction worksite. Accordingly, the Commission has stated that it will hold a general contractor responsible under § 654(a)(2) for safety standard violations which 'it could reasonably have been expected to prevent or abate by reason of its supervisory capacity.' ... Furthermore, the duty of a general contractor is not limited to the protection of its own employees from safety hazards, but extends to the protection of all the employees engaged at the worksite."); *Kelley v. Howard S. Wright Const. Co.,* 90 Wash.2d 323, 331, 582 P.2d 500, 505 (1978) (the appellant "had the right to require use of safety precautions such as lines or nets, or to halt dangerous work in adverse weather conditions. This authority alone was sufficient to establish appellant's duty to see that proper safety precautions were taken."). *See also,* Kristine Cordier Karnezis, "Who is 'employer' for purposes of Occupational Safety and Health Act (29 U.S.C.A. §§ 651 et seq.)," 153 A.L.R. Fed. 303 (1999).

**12.** *See also, IBP, Inc. v. Herman,* 144 F.3d 861 (D.C.Cir.1998) (An employee of an independent contractor, hired to clean a meat processing

**16**

Accordingly, on the record presented by the parties, we find that the circuit court did not err in holding that Southern Equipment, as the owner of the worksite, could not be held liable under OSHA. Plaintiff Robert France was not an employee of Southern Equipment, but was instead an employed by independent contractor Royalty Builders. Under these circumstances, Southern Equipment had no duty to enforce OSHA regulations for work over which it had no control.

## IV.

### *Conclusion*

We find no error in the circuit court's November 6, 2007 summary judgment order, and conclude that the order should be affirmed.

Affirmed.

Justice DAVIS dissents and reserves the right to file a dissenting opinion.

Justice WORKMAN dissents and reserves the right to file a dissenting opinion.

plant, was killed after failing to disconnect the power supply to a processing machine. The premise owner was cited for OSHA violations and appealed. The court of appeals vacated the citation, ruling that the premise owner's contractual authority to cancel the independent contractor's contract did not give the premise owner "control" over the contractor's employees.); *Ellis v. Chase Communications, Inc.*, 63 F.3d 473, 477 (6th Cir.1995) (a painter employed by an independent contractor fell to his death while painting a transmission tower on the television company's premises. The television company had attempted to minimize the risk of harm by hiring the independent contractor because of its expertise specializing in painting transmission towers. The *Ellis* court ruled that a premise owner was not liable because its duty under 29 U.S.C.A § 654(a)(2) was "defined with reference to control of the workplace and opportunity to comply with OSHA regulations."); *Vickers v. Hanover Const. Co., Inc.*, 125 Idaho 832, 875 P.2d 929 (1994) (To build an apartment complex, premise owner hired a general contractor, which hired a framing subcontractor, which hired an independent contractor. Plaintiff's decedent, working for independent contractor, was killed on the work site and sued premise owner. Court ruled that premise owner could not be liable under OSHA, stating that although premise owner "retained the right to inspect the construction site, exercise of that right was limited to inspection for the purpose of determining whether [the framing contractor's] work complied with contract specifications. This degree of limited con-

DAVIS, J., dissenting, joined by WORKMAN, J.

In this proceeding, the majority opinion has affirmed the trial court's order granting summary judgment in favor of the appellee, Southern Equipment Company (hereinafter referred to as "SEC"). In so doing, the majority of the Court has rejected the issues raised by the appellants, Langley and Inez France, individually and as the parents of Robert France (collectively referred to as "the Frances"), as to why summary judgment was inappropriate. I believe that one of the issues asserted by the Frances, the illegal employment of Robert, required reversal of the summary judgment order. Consequently, for the reasons set out below, I respectfully dissent.

### SEC Could Not Rely on the Independent Contractor Defense

The record in this case shows that SEC contracted with Quality Metal Roof (hereinafter referred to as "QMR") to have its roof

trol is not sufficient to create a duty under ... the specific duty provision of OSHA[.]"); *Tanksley v. Alabama Gas Corp.*, 568 So.2d 731 (Ala. 1990) (Alabama Gas hired independent contractor to lay natural gas pipeline. Plaintiffs, employees of independent contractor, were buried when walls of trench collapsed. Plaintiffs argued Alabama Gas should be liable because an inspector routinely visited work site to insure compliance with contract specifications. The court concluded otherwise, holding that because Alabama Gas did not, through the actions of its inspector, retain any control over the manner in which the independent contractor could perform its duties, it could not be held liable under OSHA.); *Cochran v. International Harvester Co.*, 408 F.Supp. 598, 602 (D.C.Ky.1975) (Plaintiff, a sheet metal worker employed by an independent contractor installing duct work, fell when an aluminum scaffold collapsed. The premises owner's only contact with the independent contractor was for an engineer to visit the work site two or three times a day "to see that [the work] was in compliance with the plans." The district court concluded that the premise owner had no duty under OSHA to the plaintiff, holding that "this statute does not enlarge the responsibility of owners of property to the employees of independent contractors and this Court is of the firm belief that it was not intended to apply in a factual situation, such as this, to the defendant who did not employ the plaintiff[.]").

replaced. QMR supplied the metal roofing, however, without SEC's knowledge, QMR subcontracted the actual installation of the metal roofing to Royalty Builders. Royalty Builders employed Robert. It is undisputed that Robert was only sixteen years old at the time of his employment by Royalty Builders.

One of the theories advanced by the Frances to hold SEC liable involved the illegal use of Robert, as a minor, to work on its roofing project. The circuit court rejected this theory on the basis that Robert was an employee of Royalty Builders, not SEC. This conclusion completely ignores the legal argument raised by the Frances. That is, the Frances did not dispute that Royalty Builders employed Robert. The Frances' contention was that, under this Court's decision in *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 524 S.E.2d 688 (1999), SEC lost the independent contractor defense. In resolving this issue, the majority opinion appears to reject the trial court's reliance on the fact that SEC did not directly employ Royalty Builders. However, in considering the Frances' argument, the majority opinion uses tortured reasoning to conclude that the Frances did not satisfy the *Shaffer* requirements. I disagree.

In *Shaffer*, the plaintiff, administratrix of the estate of Virginia King, filed a wrongful death action against Acme Limestone Company, Inc. (hereinafter referred to as "Acme"), a stone quarry operator.[1] The decedent, Ms. King, was killed when the car she was driving collided with a truck that was owned by Spade Trucking and driven by one of its employees. At the time of the accident, Spade Trucking was hauling materials for Acme. Although Spade Trucking was an independent contractor, the plaintiff sought to hold Acme vicariously liable on the theory that Acme, in violation of a statute, routinely overloaded trucks used by Spade Trucking.[2] The circuit court rejected this theory and granted summary judgment in favor of Acme on the grounds "that no material issue of fact existed on the issue of Spade Trucking's status as an independent contractor." *Shaffer*, 206 W.Va. at 339, 524 S.E.2d at 694.

On appeal to this Court, we found that it was error for the circuit court to reject the plaintiff's statutory violation theory. We noted in *Shaffer* that "[t]he evidence presented ... revealed that Spade Trucking's trucks routinely carried stone loads greater than the 80,000 pound maximum established by statute. ... Acme's own evidence suggests that it frequently loaded Spade Trucking's trucks in excess of 80,000 pounds." *Shaffer*, 206 W.Va. at 346, 524 S.E.2d at 701. The opinion in *Shaffer* cited to a longstanding principle of law contained in Syllabus point 5 of *Carrico v. West Virginia Central and Pacific Railway Co.*, 39 W.Va. 86, 19 S.E. 571 (1894):

> The doctrine of the nonliability of one for the negligence of another because the latter is an independent contractor does not apply to relieve the former from liability for the omission of a duty imposed upon him by law in behalf of the safety of the public.

*Shaffer*, 206 W.Va. at 345, 524 S.E.2d at 700. *Shaffer* explained the significance of the *Carrico* decision as follows:

> The obvious import of *Carrico* and its progeny is that, where the work or service to be performed in itself entails the commission of some illegal ... act, the [independent contractor defense] obviously cannot apply, because in such instance the principal and the independent contractor both play an integral part, are both proximate causes, of whatever harm ensues. The illegal work exception to nonliability requires the knowledge and sanctioning of the illegal act ... by the owner.

*Shaffer*, 206 W.Va. at 345, 524 S.E.2d at 700 (internal quotations and citations omitted).

After *Shaffer* thoroughly analyzed and discussed other authorities, the Court set out the following principles of law in Syllabus points 6 and 7 of the opinion:

> 6. The independent contractor defense is unavailable to a party employing an independent contractor when the party (1) causes unlawful conduct or activity by the independent contractor, or (2) knows of

---

1. Other defendants also were sued.

2. The plaintiff advanced other theories that are not relevant to this case.

and sanctions the illegal conduct or activity by the independent contractor, and (3) such unlawful conduct or activity is a proximate cause of an injury or harm.

7. When a statute imposes a duty on a person for the protection of others, it is a public safety statute and a violation of such a statute is prima facie evidence of negligence unless the statute says otherwise. A member of a class protected by a public safety statute has a claim against anyone who violates such a statute when the violation is a proximate cause of injury to the claimant.

Ultimately, the *Shaffer* opinion reversed the trial court's summary judgment order in favor of Acme on the grounds "that summary judgment was inappropriate because [plaintiff] established an exception to the independent contractor defense. That exception is the illegal work exception to the independent contractor defense." *Shaffer*, 206 W.Va. at 349, 524 S.E.2d at 704.

Here, the Frances argued before the circuit court and this Court that the decision in *Shaffer* precluded summary judgment because SEC knowingly allowed Robert to work on its roofing project in violation of W. Va. Code § 21–6–2(a)(16) (2002) (Repl. Vol. 2008). As previously indicated, the sole basis for the circuit court's decision to reject *Shaffer* was that "Royalty Builders was the employer of Robert France, not Southern Equipment Company." The circuit court and the majority opinion were both wrong in rejecting the application of *Shaffer* to the instant case.

West Virginia Code § 21–6–2(a)(16) of the West Virginia Child Labor Act prohibits the employment of children under the following circumstances:

(a) No child under eighteen years of age may be employed, permitted or suffered to work in, about, or in connection with any of the following occupations:

. . . .

(16) Roofing operations above ground level.

This Court previously has interpreted this provision and has indicated that "[t]he purpose of the statute . . . is to prohibit and regulate the employment of minors." *Jackson v. Monitor Coal & Coke Co.*, 98 W.Va. 58, 65, 126 S.E. 492, 495 (1925). We also have indicated that "[t]he employment of a child in violation of provisions of [the Child Labor Act] . . . is actionable negligence . . . when such violation is the natural and proximate cause of an injury." Syl. pt. 1, in part, *Harper v. Cook*, 139 W.Va. 917, 82 S.E.2d 427 (1954).

In resolving this issue, the majority opinion erroneously concludes that Robert's age played *no* role in causing him to fall. I reject this conclusion for two reasons. First, this conclusion resolves a jury issue. That is, it was for the jury to decide whether Robert's age and inexperience contributed to his fall. Second, and most importantly, the majority's conclusion on this issue insults one of the critical purposes of our Child Labor Act. The Child Labor Act takes into account that children are more susceptible to injury in the work place precisely because of the inexperience that is inherent in youthfulness. Indeed one court has correctly observed that "[i]t cannot be disputed that a primary legislative purpose of the Child Labor Law is to protect minors in employment relationships from excessive risk of personal injury. A blanket prohibition against employment in such activities as [roofing] operations fosters that purpose." *Patterson v. Martin Forest Prods., Inc.*, 774 So.2d 1148, 1151 (La.Ct. App.2000).

Under the facts of the case *sub judice*, the second *Shaffer* ground for losing the independent contractor defense is applicable. That is, under *Shaffer*, a material issue of fact exists as to whether SEC knew of and sanctioned the illegal employment of Robert. On this point, the majority opinion erroneously concludes that the Frances could not show that SEC "sanctioned" Robert's illegal employment. The majority contends that "[t]o sanction an activity requires some active approval or encouragement." However, the majority "defines the word 'sanction' far too narrowly." *Bowling v. Ansted Chrysler–Plymouth–Dodge, Inc.*, 188 W.Va. 468, 473, 425 S.E.2d 144, 149 (1992). The majority's definition *completely overrules* our line of cases that hold that a person's silence can be

deemed to be a ratification or sanctioning of conduct when that person has a duty to affirmatively disapprove of such conduct. "The authorities almost uniformly say that acquiescence after knowledge of an unauthorized act is evidence of ratification[.]" *Thompson v. Murphy*, 60 W.Va. 42, 48–49, 53 S.E. 908, 910 (1906). It is black letter law that,

> [i]f the principal, either by his conduct, by his words, or by his silence, has led others to believe that he has sanctioned an unauthorized act, performed in his behalf by his agent or by an assumed agent, he will be held to have ratified such act, whether it was his actual intention to do so or not.

*Payne Realty Co. v. Lindsey*, 91 W.Va. 127, 131, 112 S.E. 306, 308 (1922) (internal quotations and citation omitted). *Accord In re Uwimana*, 274 F.3d 806, 812 (4th Cir.2001) ("An intention to ratify may be inferred by words, conduct or silence on the part of the principal that reasonably indicates its desire to affirm the unauthorized act." (internal quotations and citation omitted)).

In support of their argument, the Frances' brief set out the following deposition testimony of SEC's vice-president on the issue of Robert's age:

Q. Did you recognize [Robert] from any of the previous days?

A. No. I seen all of them, but, you know, as far as picking him out from any of the other people, no, I did not.

Q. He didn't stand out that way?

A. Well, he was young. Younger than the other people that was working, yes.

Q. Was that apparent to you?

A. It was pretty apparent, yes.

. . . .

Q. You knew [Robert] was a kid, though, didn't you.

A. Yes.

Q. Everybody knew he was a kid?

A. Yeah.

It is crystal clear from the deposition testimony of SEC's vice-president that he knew Robert was a "kid." This admission was sufficient to preclude SEC's reliance on the independent contractor defense. *See Felder v. Old Falls Sanitation Co., Inc.*, 78 Misc.2d 868, 359 N.Y.S.2d 166, 170 (1974) (" 'Thus when one engages an independent contractor to perform certain work and the contractor employs infants in violation of the statute, the one engaging the contractor will be held to have violated the law in permitting the infant to do the work.' " (quoting *Bernal v. Baptist Fresh Air Home Soc'y*, 275 A.D. 88, 87 N.Y.S.2d 458, 464 (1949))). Ultimately, it is a jury question as to whether the vice-president's use of the word "kid" referred to Robert appearing younger than eighteen years of age. *See Styles v. Mobil Oil Corp.*, 218 Ga.App. 48, 459 S.E.2d 578, 580 (Ga.Ct. App.1995) ("[A] material issue of fact exists as to whether Mobil ratified the allegedly un[lawful] conduct of its contractors, and the grant of summary judgment to Mobil was error."). That is to say that the issue of whether the vice-president had knowledge that Robert was not of the age of majority, *i.e.*, eighteen, was a jury question.

In addition to the application of the second *Shaffer* factor, SEC could not rely on the independent contractor defense because of specific caselaw by this Court construing the meaning of "permitting or suffering" under W. Va. Code § 21–6–2(a). This is so because the statute does not require that a child be an actual employee of a business to find that a business has violated this State's Child Labor Act. In addition to prohibiting actual "employment" in certain circumstances, the statute also prohibits a business from "permitting or suffering" a child to work under the prohibited conditions.[3] *See Ewert v. Georgia Cas. & Sur. Co.*, 548 So.2d 358, 364

---

3. In this regard,

> Webster's International Dictionary, 2d ed., states that "suffer" as a verb means "to allow; to permit; not to forbid or hinder; also to tolerate; to put up with." The same authority defines the verb "permit" to mean "to allow the act or existence of; to consent to expressly or formally; to grant (one) license or liberty; to authorize; to give leave." ... The words "suffer" and "permit" necessarily imply knowledge.

*Nolde Bros., Inc. v. Chalkley*, 184 Va. 553, 35 S.E.2d 827, 833 (1945).

(La.Ct.App.1989) (Doucet, J., dissenting) ("The wording of the statute makes 'employed,' 'permitted,' and 'suffered' equal, so that violations of the statute by any of the three enumerated means are all equal violations of the statute."); *Gabin v. Skyline Cabana Club*, 54 N.J. 550, 258 A.2d 6, 9 (1969) ("If the Legislature intended to limit this section to cases where a minor was 'employed,' it would not have included the phrase 'permitted or suffered to work.' "); *Ludwig v. Kirby*, 13 N.J.Super. 116, 80 A.2d 239, 242 (1951) ("It is to be observed that not only employment of a minor … is prohibited, but also permitting or suffering him to do such work."); *Swift v. Wimberly*, 51 Tenn. App. 532, 370 S.W.2d 500, 505 (1963) ("[T]he mere permitting or suffering of plaintiff to work … at the time he was injured, constitutes a violation of said child labor statutes, even though plaintiff was never formally employed."); *Milwaukee News Co. v. Industrial Comm'n*, 224 Wis. 130, 271 N.W. 78, 83 (1937) ("It suffices to render an employer liable … under that statute that he suffered or permitted a minor … to work by assisting an employee of the employer with the latter's knowledge, actual or constructive."), *superseded by statute as stated in Beard v. Lee Enters., Inc.*, 225 Wis.2d 1, 591 N.W.2d 156 (1999). This Court has explained that "[t]o have 'permitted' or 'suffered' [a minor] to work …, defendant would have had to have knowledge that he was working there." *Harper v. Cook*, 139 W.Va. 917, 925, 82 S.E.2d 427, 433 (1954). In other words, absent an actual employer-employee relationship, a business is still "liable for having permitted or suffered a child to continue [working when it] knew, or should have known, that the child was performing work for the [business]." Syl. pt. 2, in part, *Harper, id.*

A case that illustrates the meaning of "permitting or suffering" a child to work in violation of child labor laws is *Gorczynski v. Nugent*, 402 Ill. 147, 83 N.E.2d 495 (1948). In *Gorczynski*, a thirteen-year-old boy was hired by a horse trainer, named Frank Nugent, to walk and cool off his horses after workouts or races at a race track. The boy was injured when a horse kicked him. The boy's parents sued the horse's owner, Elizabeth Nugent; Frank Nugent; and the race track owners. A jury rendered a verdict in favor of the boy and his parents. The owners of the race track appealed. One of the issues raised by the race track owners was that they did not employ the boy. Therefore, the track owners argued that they could not be held liable for violating the child labor law, which prohibited employment of the boy because of his age. The appellate court in *Gorczynski* rejected the argument as follows:

The facts in this case establish that plaintiff was illegally employed at a gainful occupation by the Nugents in connection with appellants' place of amusement, which would leave for determination the remaining or principal question whether appellants 'permitted or suffered' plaintiff to so work. Appellants urge they are not liable because the Nugents were not their employees and appellants had no control over plaintiff's employment by the Nugents. In the case of *Purtell v. Philadelphia & Reading Coal & Iron Co.*, 256 Ill. 110, 99 N.E. 899, 902 [ (Ill.1912) ], the plaintiff, a minor under the statutory age, was employed as a water boy by coal pushers working in defendant's coal yard. While so employed he was injured and filed suit under the Child Labor Act. It was there held that the relation of master and servant is not necessary in applying the act. The court specifically said in that case, 'The coal pushers who hired appellee were servants of appellant and were entirely under its control. The latter had the right to order its employees to hire no boys under lawful age to carry water, and to enforce obedience to such order.' In the instant case the Nugents were not employees of appellant and to that extent this case is different from the *Purtell* case. However, an examination of the evidence shows that the right to control the Nugents' conduct on appellants' premises was as extensive as if they had been employees.

. . . .

It is apparent from the evidence in this case that [appellants] could have caused a suspension of the Nugents for violation of the law, could have prevented the plaintiff from entering the stable area, and were under a positive duty to investigate both the Nugents and the plaintiff and require

the plaintiff be either discharged or furnished with proper credentials. We hardly see how the power of control over the Nugents and plaintiff could have been more complete. We said in the *Purtell* case, 'It is the child's working that is forbidden by the statute, and not his hiring, and, while the statute does not require employers to police their premises in order to prevent chance violations of the act, they owe the duty of using reasonable care to see that boys under the forbidden age are not suffered or permitted to work there contrary to the statute.' We find here that appellants knew or could have known by the exercise of reasonable care, ... that plaintiff was illegally employed on its premises and under such circumstances permitted or suffered plaintiff to work in violation of the statute.

*Gorczynski*, 83 N.E.2d at 498–99.

Under *Gorczynski* and this Court's precedent, it was and is irrelevant that SEC did not employ Robert. Pursuant to W. Va. Code § 21–6–2(a)(16), SEC could be held liable for "permitting or suffering" Robert to work on its roof if it knew or reasonably should have known that Robert was younger than eighteen years old. This issue, like the *Shaffer* analysis, presented a jury question.

In view of the foregoing, I respectfully dissent. I am authorized to state that Justice Workman joins me in this dissenting opinion.